**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| v. | : | **CRIMINAL NO. 11-186 (JDB)** |
| | : | |
| **TAVIA CRUDUP,** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S JUSTIFICATION FOR PLEA AGREEMENT AND MEMORANDUM**
**IN AID OF SENTENCING**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in aid of sentencing.

**I.   BACKGROUND**

**A.   Procedural Summary**

On September 16, 2011, Defendant entered a guilty plea pursuant to Rule 11(c)(1)(C) of the current Federal Rules fo Criminal Procedure to one count of Tampering with Evidence, in violation of 18 U.S.C. §1512(c)(1), and one count of Obstruction of the Enforcement of Sex Trafficking of Minors, in violation of 18 U.S.C.§ 1591(d). The rule provides, in relevant part:

An attorney for the government and the defendant's attorney, or the defendant when proceeding pro se, may discuss and reach a plea agreement.  The court must not participate in these discussions.  If the defendant pleads guilty or nolo contendere to either a charged offense or a lesser or related offense, the plea agreement may specify that an attorney for the government will:

\* \* \*

>> (C) agree that a specific sentence or sentencing range is the appropriate disposition of the case, or that a particular provision of the Sentencing Guidelines, or policy statement, or sentencing factor does or does not apply (such a recommendation or request binds the court once the court accepts the plea agreement).

In this case, counsel for the United States and for defendant reached a plea agreement that the appropriate sentence is 12 months and one day in prison.

### A. Sex Trafficking of Children

Between May 5, 2011 and May 31, 2011, fourteen year-old B.B. and a thirteen year-old girl (hereinafter referred to as "Minor") ran away from their respective homes in another state, rode the metro to D.C. and ended up staying at an apartment in D.C. Both girls were particularly vulnerable and young. They immediately began staying at an adult's house, where they were introduced to Robert Brathwaite. Brathwaite was told by the adult with whom the girls were staying that the girls wanted to "prostitute" and had arrived to his house together. At their first meeting, B.B. was silly and reckless, and asking Brathwaite all about being a prostitute and how fun that would be. B.B. told Brathwaite that she was 18 years-old and the Minor told him that she was 15 years-old. Almost immediately, Brathwaite began driving to various places in Maryland and D.C. and, specifically, Brathwaite transported B.B. from Maryland to D.C. to prostitute for him. On the first night that Brathwaite took B.B. to the track, they stopped on the way to pick up an adult prostitute who identified herself as "Rain" and "Cupcake" and was later identified as defendant Tavia Crudup. That first night, on the ride from Maryland to the "track" in D.C., defendant Brathwaite along with Crudup "schooled" B.B. about how much money to charge for straight sex and oral sex, where to go on the track, what to say to "johns", how to keep in touch with Brathwaite, how to conduct themselves and various other techniques to use to "trick." Brathwaite gave B.B. a cell phone and

instructed her to use it to receive calls from Brathwaite and to keep in touch with him while she was on the track. Brathwaite told B.B. to call him "daddy."

The evidence at trial would have shown that once B.B. arrived on the "track" located in downtown D.C., Brathwaite and Crudup instructed her to get out of the car and wait for cars to approach her. On the first night, the 14 year-old got out of Brathwaite's Lexus, wobbled on the high heeled shoes that she was told to wear, and stood on the street. Almost as soon as her high heels hit the street, men stopped their cars and began vying for attention. On that first night, B.B. led the men in an alley behind a gas station, in the back seat of cars with strange adult men, letting them have their way with her, having sexual intercourse with her, sucking on their penises – all in exchange for money. Upon finishing, she dutifully called Brathwaite with the phone that was given to her, met him at the prearranged location, and gave him the money she had just earned. These events were repeated on the next night when Brathwaite again picked up B.B. from the apartment in S.E. Washington, D.C. and Crudup from Maryland and transported them to the track again. During the car ride to the "track," Brathwaite provided B.B. with marijuana. On the second night, B.B. had sexual contact with at least one adult male in exchange for money.

On May 11, 2011, B.B. and Minor were stopped by police for "truancy" and sent to their respective families in another state. While at the police station, the girls sent text messages to Brathwaite informing him about their arrest. Brathwaite responded saying that he was going to get "Rain" to come and pick them up. Evidence would have shown that one of the girls changed Brathwaite's contact name in the cell phone to "dad" so that no one would know to whom they were communicating. Neither of the girls reported the prostitution to the police. Before returning the girls to their respective guardians, the police kept B.B.'s phone.

On May 31, 2011, B.B. and two other juveniles traveled back to D.C.  Once in D.C., B.B. called Brathwaite to tell him that she was back in D.C. and that she had brought another girl with her who wanted to prostitute. Brathwaite agreed to meet up with them later in the evening.  Before B.B. and the other juvenile could meet Brathwaite that evening, they were picked up by police for truancy again.  This time, B.B. reported to authorities what the defendants had done, and a one-party consent recorded call was made to Brathwaite.  During the course of that call, B.B. told Brathwaite that she wanted him to pick her up to go on the "track."  Brathwaite asked B.B. if she had shoes to wear (i.e. high heels) and agreed to take her to the "track."  A few hours later, Brathwaite and Crudup arrived at the prearranged meeting place to pick up B.B. and to take her to the "track."  Brathwaite was driving his vehicle, a Lexus SUV, and Crudup was in the front passenger seat.  Upon arrival, they were both identified and Brathwaite was arrested for sex trafficking of children.

When a search warrant was executed later, the police found a computer in the vehicle which contained images of Crudup, who advertised herself as "Candy Rain" and "Rain,", posing at Brathwaite's apartment and wearing the same silver high heeled shoes that she insisted on retrieving from the SUV on the night of Brathwaite's arrest.

    **B.**    **Evidence of Obstruction and Tampering**

In the days after Brathwaite's arrest, Crudup attended Brathwaite's court hearings and learned the nature of the charges against him.  Between May 31, 2011 and June 2, 2011, Crudup entered Brathwaite's apartment and destroyed very powerful evidence which would have been used against Brathwaite. Specifically, the evidence would show that Crudup gathered up all of the clothing belonging to B.B., stuffed it all in a trash bag and instructed another person to throw away "that little bitch's clothes."

On June 2, 2011, Crudup appeared in the United States Attorney's Office and spoke to government prosecutors. Crudup insisted that she was not a prostitute, and had never seen B.B. or any juveniles with defendant Brathwaite ever. Crudup told prosecutors that she had gone to Brathwaite's apartment the night before solely to feed his dogs. That same night, after Crudup had been told not to go back to Brathwaite's apartment, when law enforcement arrived at the apartment to execute a search warrant, Crudup was there again.

In a recorded telephone conversation on June 9, 2011, from D.C. Jail between Brathwaite and Crudup, Crudup told Brathwaite "sorry I didn't take that when I came there but I just was like, I didn't think they was gonna come to your house...cause I would have took your computer, I would have took all your stuff." On June 12, 2011, in a recorded telephone conversation at D.C. Jail about B.B., Crudup told Brathwaite, "it'd be real funny if that bitch just disappeared. But I know that they probably got her in some type of custody, some type of program or something."

On June 18, 2011, during the course of a recorded telephone conversation at D.C. Jail between Brathwaite and "Ty," Brathwaite told Ty that Ty "need to stay on, stay on uh, lil, lil youngin', make sure his mouth is shut the fuck up." After Brathwaite was informed that they found a gun in his Lexus, in a recorded telephone conversation from D.C. Jail between Crudup and Brathwaite, Brathwaite stated that he wanted Crudup to contact a witness to take the blame for the gun.

## II.     SENTENCING CALCULATION

### A.     Statutory Maximums

Count One: A violation of Title 18, United States Code, Section 1512(c)(1) carries a statutory maximum of twenty years in prison, a fine of $250,000, and a term of supervised release of not more than three years. See 18 U.S.C. §3583(b)(2).

5

Count Two: A violation of Title 18, United States Code, Section 1591(d) carries a statutory maximum of twenty years in prison, a fine of $250,000, and a term of supervised release of not more than three years. See 18 U.S.C. §3583(b)(2).

### B. Sentencing Guidelines Calculation

Counts Four and Five are grouped for guideline calculations. See USSG §3D1.2(b)and (c). The Guideline calculation in the Presentence Report places the defendant's total offense level at 27. See PSR ¶ 40. This calculation contemplates a base offense level for Count Group 1 at 24 (PSR ¶ 30) a two level enhancement for influencing a minor to engage in prostitution described in §2G1.3(b)(2)(B), See PSR ¶ 31, a two level enhancement for the involvement of a commercial sex act described in §2G1.3(b)(4)(B), See PSR ¶ 32, a two level enhancement for obstruction of justice), See PSR ¶ 35, minus three levels for acceptance of responsibility, See PSR ¶ 38 and 39.

Defendant's criminal history was calculated at I. Thus, with a total offense level of 27, and a criminal history calculation of I, the guideline range is 70 to 87 months, see PSR ¶ 69.

### C. Victim Impact Statements

The victim impact statement for both B.B. and B.B.'s grandmother will be submitted under seal by a separate motion. The government made significant efforts to obtain a Statement from the "Minor", but was unable to do so.

### III. GOVERNMENT'S RECOMMENDATIONS

For the reasons set forth below, the government respectfully recommends that the Court accept the plea agreement and sentence the defendant to a total of 12 months and one day in prison. This sentence satisfies the requirements set forth in Title 18, United States Code, Section 3553(a).

### A. Basis for Government's Sentencing Recommendation

From 1974, when the Federal Rules of Criminal Procedure were amended to include rules

governing plea bargaining, to the present, Rule 11 has included an explicit provision allowing for the government and the defendant to bargain pretrial for an agreed upon sentence in exchange for a guilty plea. See Fed. R. Crim. P. 11 Advisory Committee's Note. In formalizing procedures to govern the practice of plea bargaining, the Advisory Committee conceded "both the inevitability and the propriety of plea agreements." Id. (describing the purpose of the 1974 amendments set forth in then subdivision (e) of Rule 11). Quoting the Supreme Court in Santobello v. New York, 404 U.S. 257, 260 (1971), the Committee noted that "[t]he disposition of criminal charges by agreement between the prosecutor and the accused, sometimes loosely called 'plea bargaining,' is an essential component of the administration of justice. Properly administered, it is to be encouraged." Fed. R. Crim. P. 11 Advisory Committee's Note. In the context of plea bargaining, there are instances where the mutually beneficial outcome for both the government and the defendant includes an explicit agreement as to the defendant's sentence. The Advisory Committee's note to Rule 11 acknowledges that certainty in one's sentence may be a key consideration in the bargaining process.

Starting from the premise, as the Supreme Court did in Santobello, that the efficient disposition of criminal cases by way of plea bargain, when properly administered, "is to be encouraged," the United States advocates the acceptance of defendant's plea. While it falls outside of the Guideline range, the negotiated sentence of imprisonment of 120 months is an appropriate and reasonable outcome in this case considering the factors to be weighed by a sentencing court pursuant to 18 U.S.C. § 3553(a) – the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence imposed as opposed to the kinds of sentences available.

Here, the defendant is a young woman who was working as a prostitute from a very young

age herself. If not for her actions involving the obstruction of justice and tampering with evidence, she would not have even been charged. Indeed, undersigned counsel viewed Crudup, in a sense, as a victim herself who was being thoroughly manipulated and used by Brathwaite for his own purpose. It was not until she committed these brazen and inexcusable acts of obstructing evidence that undersigned counsel just could not simply ignore. However, these acts of obstruction–as serious and sinister as they were, may be in part due to the pathology of being victimized and dominated by defendant Brathwaite, and less about the desire to protect herself; i.e. a misguided desire to protect her pimp no matter what the consequences.

Finally, and most importantly, her plea ensures that the children do not have to testify. As explained in the Memorandum written in <u>United States v. Robert Brathwaite</u>, the fact that the children do not have to testify carries significant weight for undersigned counsel–it allows these children to see that justice in this case was swift and fair–and it relieves them of the very frightening idea that they, very young teenagers, would have to expose themselves and what they did in an open courtroom for all the world to see. At the same time, it ensures that the defendant will be convicted, and that she will serve some period of time in jail. For the children, it takes the unknown, the scary prospect of embarrassment and humiliation, off the table, and gives them certainty, security and closure. Thus, undersigned counsel believes that the totality of these circumstances justifies the proposed plea.

## IV. CONCLUSION

Wherefore, the government respectfully requests that the Court accept the plea agreement and sentence the defendant to 12 months and one day in prison, followed by a 12 month term of supervised release.

> Respectfully submitted,
> RONALD C. MACHEN JR.
> United States Attorney
> Bar No. 447-889
>
> By:     /s/
> JULIEANNE HIMELSTEIN, D.C. Bar 417-136
> DAVID B. KENT, D.C. Bar 482-850
> Assistant United States Attorneys
> Sex Offense and Domestic Violence Section
> 555 4th Street, N.W., 10th Floor
> Washington, D.C. 20530
> (202) 252-7566
> (202) 305-0652